IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION OF    )
THE UNITED STATES OF AMERICA FOR AN    )    <u>FILED UNDER SEAL</u>
ORDER AUTHORIZING THE ISSUANCE OF    )
SEARCH WARRANTS    )

<u>**AFFIDAVIT**</u>

I, Norma Horne, am a police officer of the District of Columbia Metropolitan Police Department (MPD), having been duly sworn, state:

## I.  INTRODUCTION

I am an investigative and law enforcement officer of the United States and District of Columbia who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in the Comprehensive Drug Abuse Prevention and Controlled Substances Act of 1970, Title 21 of the United States Code (USC), as amended and the Uniform Controlled Substances Act, Title 48 of the District of Columbia Code as well as Title 18 offenses.

I am an officer of the District of Columbia Metropolitan Police Department and have been so employed for over 14 years.  I have received narcotics specialization training from the Metropolitan Police Department Training Division, the United States Attorneys Office and gang training from the Mid Atlantic Great Lakes Organized Crime Law Enforcement Network.  I have attended the Expert Witness class offered by the Major Narcotics Branch, MPD.  I have also received firearms trafficking and identifying an armed subject training from the Bureau of Alcohol Tobacco and Firearms.  I have been personally involved in numerous narcotics and weapons investigations throughout the District of Columbia, with concentrated efforts in the Northeast area of the city.  I have worked in an undercover capacity during which I purchased

firearms and a controlled substance.  As a result of these experiences and formal training, I am

familiar with the actions, habits, traits and terminology utilized by the traffickers and abusers of

controlled dangerous substances. I have prepared and participated in the preparation and

execution of over two hundred search and arrest warrants.  I also have testified as a witness in the

Superior Court and United States District Court for the District of Columbia.

In the course of conducting these investigations, your affiant has been involved in the use

of the following investigative techniques:  interviewing informants and cooperating witnesses;

conducting physical surveillance; conducting short-term and long-term undercover operations,

including reverse undercover drug operations; consensual monitoring and recording of both

telephonic and non-telephonic communications; analyzing telephone pen register and caller

identification system data; conducting court-authorized electronic surveillance; and preparing

and executing search warrants which have led to substantial seizures of narcotics, firearms and

other contraband.

Through instruction and participation in investigations, your affiant has become familiar

with the manner in which narcotics traffickers conduct their illegal business and the methods,

language, and terms that are used to disguise conversations about their narcotics activities.  From

experience and training, your affiant has learned, among other things, that:(a) drug traffickers

virtually never expressly refer to cocaine or other illegal drugs by name; instead to conceal the

true nature of their illegal activities and to thwart detection by law enforcement, they refer to the

drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use

electronic paging devices, commonly referred to as pagers or beepers, cellular telephones, digital

telephones, and other communications devices to further their illegal activities by, among other

2

things, remaining in constant or ready communication with one another without restricting either

party to a particular telephone or location at which they might be the subject of physical

surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-

arranged numerical codes to pagers or telephones to identify themselves or to otherwise

communicate information, such as price or quantity of drugs, to the person in possession of the

pager.

       Throughout this investigation, your affiant has worked with other Special Agents (SAs)

of the FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD)

assigned to the Safe Streets Task Force.  This affidavit is based on my personal knowledge

derived from my participation in this investigation, as well as speaking with other law

enforcement officers assigned to this investigation, and includes, but is not limited to, the

following information: (a) oral and written law enforcement reports regarding this and other

related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen

register records) and telephone toll records; (d) review of vehicle registration records and

licenses; (e) review of criminal history records; and (f) review of wire interceptions pertaining to

the target telephone authorized by United States District Court Judge Paul L. Friedman on

September 2, 2005, and extended on September 30, 2005, and (g) debriefings of confidential

informants.

       Based upon my training and experience, as well as the corporate knowledge and

experience of other agents and police officers in my office, I am aware that it is generally a

common practice for drug traffickers to store their drug inventory and drug-related paraphernalia

(including scales and ziploc bags and other packaging materials used in the distribution of

cocaine) in their residences and the residences of co-conspirators. Further, based on the information developed in this investigation it is my opinion that the "target subjects" are using the above-described premises to store the cocaine they are selling. Further, it is generally a common practice for drug traffickers to maintain in their residences and the residences of co-conspirators records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

It is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

4

## LOCATION TO BE SEARCHED

The description of the following address was obtained through physical surveillance by your affiant and/or other law enforcement officers.

**1960 Montana Avenue, Northeast, Washington, D.C.**

Is described as a multi-level warehouse-style building with a reddish colored awning running nearly the length of the building .  There is another reddish colored awning over the main entrance with the words "SCOOPIE'S" and "SOUL CAFÉ" written on the awning in white letters.  On what appears to be the upper level of the building is a white sign with the club name "LEVELS" written in red along with the club telephone number "202-269-0100."

## TARGETS OF THE INVESTIGATION

As described below, an extensive investigation has developed probable cause to believe that the following individuals and others are involved in an ongoing drug conspiracy: **ANTOINE JONES, a/k/a "TOINE"; DENISE JONES, a/k/a DENIECE JONES, a/k/a DENICE JONES (**wife of **ANTOINE JONES); LAWRENCE MAYNARD; ADRIAN JACKSON; MICHAEL HUGGINS; ANJA HUGGINS (**wife of **MICHAEL HUGGINS);  KEVIN LAMONT HOLLAND; DEMETRIUS CORTEZ JOHNSON; JOHN ADAMS; SIMONA ADAMS (**wife of **JOHN ADAMS); PAULINE SPENCE** and **GREGORY HAWKINS.**

The criminal histories of some of the target subjects of this investigation are as follows:

**ANTOINE JONES**, a/k/a **ANTONIO JONES, a/k/a/ "TOINE**" is a black male, born on XXXXXXXX XX, 1960.  He is described as 6'2" tall and approximately 220 pounds, with a Social Security Number of XXX-XX-0916.  A search of FBI criminal history records for **JONES** (FBI# 901461KA2) revealed the following: 1994, District of Columbia, Conspiracy to Distribute

50 Grams or More of Cocaine Base, Possession with Intent to Distribute 50 Grams or More of

Cocaine Base, and Possession with Intent to Distribute Cocaine, guilty, sentenced to ten years'

imprisonment, placed on supervised release until April 25, 2007; 1989, District of Columbia,

Carrying a Pistol Without a License and Disorderly Conduct, dismissed; 1991, Arlington,

Virginia, Selling Cocaine, Guilty; 1993, District of Columbia, Possession of an Unregistered

Firearm and Possession with Intent to Distribute Cocaine, dismissed.

**DENISE JONES, a/k/a DENIECE JONES, a/k/a DENICE JONES (wife of**

**ANTOINE JONES)** is a black female, born on XXXXX XX, 1963.  She is described as

approximately 5'5" tall and 190 pounds.  A search of FBI criminal history records for **DENIECE**

**JONES**  revealed no known criminal history.

**LAWRENCE MAYNARD** is a black male, born on XXXXXX XX, 1961.  He is

described as approximately 6'2" tall and 240 pounds, with a Social Security Number of XXX-

XX-7661.  A search of FBI criminal history records for **MAYNARD** (FBI #512598TA1)

revealed the following:  1993, District of Columbia, Distribution of Cocaine, found not guilty.

**ADRIAN JACKSON** is a black male, born XXXX XX, 1978.  He is described as 5'8"

tall and 185 pounds, with a Social Security Number of XXX-XX-3106.  A search of criminal

history record for **JACKSON** (FBI# 941681FB3) revealed that he has convictions for narcotics

and weapons offenses, his most recent conviction being for Carrying a Handgun in Maryland in

2004; in addition, he has a pending case for Carrying a Pistol without a License in the District of

Columbia, for which he was indicted in December, 2004.

**MICHAEL ANDRE HUGGINS** is a black male, born XXXXX XX, 1964.  He is described as 5'11" tall and 171 pounds, with a Social Security Number of XXX-XX-0221.  A search of FBI criminal history records for **HUGGINS** (FBI# 200725JA2) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Providing Contraband (Heroin) to an Inmate, in 1995.

**ANJA HUGGINS** is a black female, born XXXXXXX X, 1965.  She is described 5'4" tall and 135 pounds, with a Social Security Number of XXX-XX-2847.  A search of FBI criminal history records for **ANJA HUGGINS** revealed no known criminal history.

**KEVIN LAMONT HOLLAND** is a black male born on XXXX X, 1976.  He is described as 5'11" tall and 175 pounds, with a Social Security Number of XXX-XX-6438.  A search of FBI criminal history records (FBI# 179452CB8) revealed that he has a1996 conviction in United States District Court in Virginia for Conspiracy to Distribute 50 Grams or More of Cocaine Base, for which he was sentenced to 120 months' incarceration in October, 1997.

**DEMETRIUS CORTEZ JOHNSON** is a black male born on XXXXXX X, 1967.  He is described as 6'3" tall and 180 pounds, with Social Security Numbers XXX-XX-9144 and XXX-XX-8144.  According to toll records, he uses cellular telephone number (301) 751-7614, with a listed address of XXXXX XXXX XXXX, Clinton, Maryland.  A search of FBI criminal history records (FBI# 400182HA0) revealed that he has a 1987 conviction in Superior Court for the District of Columbia for UCSA Cocaine and an arrest in 02/1994 in Prince George's County, Maryland for Battery.

7

**JOHN ADAMS** is a black male, born XXXX XX, 1965.  He is described as 5'9" tall and 190 pounds, with a Social Security Number of XXX-XX-3396.   A search of FBI criminal history records for **ADAMS** (FBI# 952661CA4) revealed that he has convictions for narcotics, weapons, and  property offenses, including a 1993 conviction in the District of Columbia for Carrying a Pistol without a License.

**SIMONA ADAMS** is a black female born XXXXXXXX XX, 1973.  She is described as 5'3" tall and 150 pounds with a Social Security Number of XXX-XX-9951.  A search of FBI criminal history records for **SIMONA ADAMS** (FBI# 232866TB7) revealed a July 2001 arrest for Misdemeanor Disorderly in Alexandria, Virginia.

**PAULINE SPENCE** is a black female born XXXXXXXXX XX, 1958.  She is described as 5'4" tall and 189 pounds and uses Social Security Number XXX-XX-7945.  **SPENCE** is believed to reside at XXXX XXXXXXX XXXX, XX, XXXXXXXXX X, Washington, D.C., but has a second address of XXX XXXXX XXXXXX, in Prince Georges County, Maryland.  A search of FBI criminal history records (FBI#: 760576KA1) revealed that she has a conviction in the United States District Court for the District of Columbia for Distribution of Cocaine, in 1989, along with numerous arrests in Georgia for property offenses.

**GREGORY HAWKINS** is a black male born XXXXXXXX XX, 1945.  He is described as 5'5" tall and 142 pounds with a Social Security Number XXX-XX-1974.  A search of FBI criminal history records for 221410P4 revealed that HAWKINS' criminal history was expunged in 1977.

## PROBABLE CAUSE GENERALLY

### A.  Prior to First Interception

1.  In October, 2004, the FBI obtained information that a large narcotics trafficking organization was operating in the greater Metropolitan Washington, D.C., area and elsewhere.

2.  Based on information obtained from confidential sources and corroborated by physical surveillance, analysis of telephone records and pen registers, and other investigative techniques, the FBI learned that **ANTOINE JONES** is a major supplier of large quantities of cocaine, including kilogram quantities, for the organization.

3.  **ANTOINE JONES** is the sole proprietor of a nightclub named "**LEVELS**," which is located at 1960 Montana Avenue, N.E., Washington, D.C.  Investigators believe that **ANTOINE JONES** uses his business as a location where he can conduct his drug trafficking activities, as well as launder drug trafficking proceeds.  **LAWRENCE MAYNARD**, one of **JONES's** drug associates, is listed as the "A.B.C. manager" of the nightclub in the records on file with the District of Columbia Alcoholic Beverage Regulatory Agency (ABRA).

4.  During the course of this investigation, a number of confidential sources, who are cooperating with law enforcement, provided details regarding **ANTOINE JONES'** large-scale narcotics trafficking organization.  The information provided by these confidential sources has been corroborated by independent investigation, including but not limited to surveillance, search warrants, debriefings of additional confidential sources and witnesses, a review of available subscriber information and pen-register data, and a review of stored text-messages on the cellular telephones of **MAYNARD** and **ANTOINE JONES**, obtained via search warrant.  Information from two of those sources is highlighted forthwith.

Confidential Source Number One

5.  Confidential Source Number One, hereinafter referred to as CS-1, has known

**ANTOINE JONES**, **a/k/a "TOINE,"**  since sometime in the summer of 2003.  CS-1 met

**LAWRENCE MAYNARD,** through **ANTOINE JONES**, sometime thereafter.  CS-1 has

identified photographs of **ANTOINE JONES** and **MAYNARD.**

6.  In the summer of 2003, CS-1 began buying multiple kilogram quantities of cocaine

directly from **ANTOINE JONES**.  CS-1 estimated having purchased in excess of fifty (50)

kilograms of cocaine directly from **ANTOINE JONES** over the course of their drug business

relationship which extended from the summer of 2003 until the fall of 2004.

7.  Investigators' belief that **ANTOINE JONES** and **MAYNARD** are selling wholesale

quantities of cocaine to numerous customers in the greater Washington, D.C., area is confirmed

by CS-1's report that he knew several individuals throughout the greater Washington, D.C. area

who also were buying cocaine from **ANTOINE JONES** during the period during which CS-1

purchased cocaine from **ANTOINE JONES** because, as CS-1 described, **ANTOINE JONES'**

prices were good; he usually charged  CS-1 $20,000.00 per kilogram.  On numerous occasions

during 2004, CS-1 saw a number of persons known to it to be wholesale narcotics distributors at

special events nights at **ANTOINE JONES'** club **LEVELS**, located at 1960 Montana Avenue,

N.E., Washington, D.C.

8.  CS-1 reported that, based on its conversations with **ANTOINE JONES** and

**MAYNARD**, **ANTOINE JONES** and **MAYNARD**  traveled out of the Metropolitan

Washington, D.C., area near the end of each month to obtain multiple-kilogram quantities for

cocaine for redistribution.  While CS-1 does not know precisely where **ANTOINE JONES** and

**MAYNARD** traveled to pick up the narcotics, it recalled hearing **ANTOINE JONES** state that they were "goin' down the road" and refer to "Carolina." Further, CS-1 noted that **MAYNARD** and **ANTOINE JONES** always returned from their trip to obtain narcotics within 24 hours of departing, and often called CS-1 during the trips from **MAYNARD**'s cellular phone, (301) 613-6293, or a pre-paid disposable cellular phone, which CS-1 referred to as a "throw away phone". In the background of such telephone calls, the most recent of which took place in fall 2004, CS-1, who is familiar with money counting machines, occasionally heard the distinctive sound of a money-counting machine. CS-1 additionally reported that, while it was not aware of the specific identity of **ANTOINE JONES'** narcotics supplier, it recalled **ANTOINE JONES** or **MAYNARD** mention narcotics coming from "the Mexicans" and "Texas."

9. CS-1's information is corroborated by a traffic stop of **MAYNARD** on April 5, 2005. The Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a traffic stop of a 1997 Honda Odyssey mini-van bearing Maryland tags 273M195, operated by **MAYNARD** and also occupied by **DERRICK GORDON** in the vehicle front passenger seat. Their investigation revealed that this car was registered to **ANTOINE JONES**, with a date of birth of XXXXXXXX XX, 1960, and to one of his residences, XXXXX XXXXXXXXXX XXXX, Brandywine, Maryland. In the course of further investigation, the interdiction unit canine alerted on the right rear passenger area of the mini-van. A search of the mini-van revealed a hidden compartment in the van, which contained six white plastic Target shopping bags, containing a total of $67,115.00 in U.S. currency, in various denominations, held together by rubber bands. When interviewed by the Interdiction Unit, **MAYNARD** and **GORDON** both denied any knowledge of the secret compartment and the money contained therein. The Honda

11

Odyssey was impounded, the $67,115.00, was seized as evidence, **MAYNARD** and **GORDON**
received a warning ticket, and then were released without additional charges.

10.  During the course of its drug trafficking relationship with  **ANTOINE JONES** in

2003 and 2004, CS-1 met **ANTOINE JONES** at various locations throughout the Washington,

D.C. Metropolitan area to conduct transfers of both money and drugs. CS-1 reported that, in

order to designate meeting locations for the transfer of money and narcotics, CS-1 and

**ANTOINE JONES** frequently used special codes.  For example, CS-1 knew that any reference

to "supplies" meant that **ANTOINE JONES** wanted to meet at the Home Depot in Landover,

Maryland.  When **ANTOINE JONES** said to meet at "the gym," CS-1 knew to go to the work

out complex near FedEx Field, also in Landover; references to "the club" meant that **ANTOINE**

**JONES** wanted to meet at **LEVELS**.  Indeed, whenever **ANTOINE JONES** told CS-1 to meet

him at the club, CS-1 knew that **ANTOINE JONES** had drugs on-hand.  Similarly, as noted

*supra*, while still out of the area picking up the wholesale quantities of narcotics, **ANTOINE**

**JONES** often would call CS-1 from a prepaid disposable phone and tell CS-1 that he wanted to

"meet in the morning for breakfast." CS-1 noted that the parties never actually ate breakfast, but

rather, this was a code indicating that **ANTOINE JONES** would have narcotics available for

purchase the following morning.

11.  CS-1 reports that  **ANTOINE JONES** drove several different vehicles when making

deliveries of cocaine to CS-1, including a white van, and a gold or champagne-colored Jeep

Cherokee.  Surveillance of **LEVELS**, over a several-month span in 2004 and 2005, revealed that

a white Plymouth van, with Maryland registration 097M893, was parked outside the club on

several occasions.

12

12. From time to time, CS-1 also went to **ANTOINE JONES's** club **LEVELS** to pick up the cocaine it had ordered. CS-1 would sometimes drop a bag, such as a department store bag, a grocery store bag or a dark colored backpack containing money at a designated location within the club. **ANTOINE JONES** would then direct CS-1 to his truck, described as a gold or champagne-colored Jeep Cherokee, that was parked outside the night club. **ANTOINE JONES** would unlock the truck for CS-1 using the automatic key remote and CS-1 would retrieve the designated number of kilograms of cocaine from the cocaine stored in the vehicle.

Confidential Source Number Two

13. In 2003 and 2004, Confidential Source Number Two (herein referred to as "CS-2")**,** CS-2 bought kilogram quantities of powder cocaine approximately ten times from **ANTOINE JONES.** CS-2 was arrested in 2004 with a large wholesale quantity of cocaine that CS-2 had recently purchased from **ANTOINE JONES**.

14. CS-2 met **ANTOINE JONES** sometime around November, 2003, through a person with whom CS-2 dealt on a regular basis. This person told CS-2 that it had a long-term drug business relationship with **ANTOINE JONES**. For several months in late 2003 and early 2004, CS-2 purchased cocaine from **ANTOINE JONES** through this middleman in quantities ranging from an eighth of a kilogram to a kilogram. CS-2 was present and observed the transactions in which the middleman purchased cocaine from **ANTOINE JONES** on behalf of CS-2. In late 2003 or early 2004, CS-2 and **ANTOINE JONES** began to transact business in person, without the aid of a middleman, in larger, multiple-kilogram quantities.

15. According to CS-2, **ANTOINE JONES** sells high quality cocaine at a reasonable price. **ANTOINE JONES** initially charged CS-2 $23,000.00 per kilogram of cocaine; but, he eventually lowered the price to $21,000.00 per kilogram.

16. CS-2 heard that **ANTOINE JONES** purchased a warehouse on a corner off Bladensburg Road, near the Fifth Police District, which **ANTOINE JONES** began operating as a nightclub. These sources told CS-2 that **ANTOINE JONES** invested a lot of money in the club. Although invited, CS-2 never went inside of the club. However, CS-2 has spoken with other drug dealers with whom it associated who told it that they purchased cocaine from **ANTOINE JONES** inside the club, including multiple-kilogram quantities of cocaine. Investigation has determined that in May 2004, **ANTOINE JONES** leased the night club **LEVELS,** located at 1960 Montana Avenue, N.E., Washington, D.C., for the period May 2004, until May 2014.

17. CS-2 said that the beginning of each month is the best time to purchase cocaine from **ANTOINE JONES** because CS-2 believes this is when **ANTOINE JONES** receives his supply of cocaine. According to CS-2, during the period when he was buying cocaine from **ANTOINE JONES** the kilograms of cocaine were wrapped in multiple layers of saran wrap and there were generally two (2) wrapped together. Once taken apart, CS-2 said the kilograms were individually wrapped in what CS-2 described as some kind of wax material. CS-2 reported that the individual kilograms were then stamped with distinctive marks such as crosses or two cars.

18. When CS-2 arranged to purchase cocaine from **ANTOINE JONES**, it would meet **ANTOINE JONES** in various locations in the Washington, D.C. metropolitan area. On these occasions, CS-2 observed **ANTOINE JONES** driving a white Dodge Caravan and a Champagne colored Jeep.

14

19.  Like CS-1, CS-2 also stated that **ANTOINE JONES** transported the cocaine in shopping bags or backpacks which **ANTOINE JONES** had stored in the back of his vehicle. Whenever CS-2 met **ANTOINE JONES**, **ANTOINE JONES** was always by himself and wore sunglasses and a hat.  CS-2 would make payments in the same way, transporting the cash payment in a shopping bag or backpack

**B.  <u>First Interception Period -- September 3 - September 30, 2005</u>**

20.  The following is a summary of the Court-authorized interceptions of **JONES'** conversations on the **target telephone** with other targets of this investigation, including some examples of specific calls.

21.  As an initial matter, the content and timing of many of **JONES'** calls demonstrates a clear pattern of suspicious contacts with several individuals, involving the timing and location of meetings, but without any other substantive content.  For example, on Day 2 of the interception period, September 3, 2005, beginning at approximately 9:00 a.m., **JONES** made a series of telephone calls to several individuals, all within a few minutes of each other, and left a message for each, asking that person to call him back.  Over the course of the ensuing few hours, **JONES** spoke in person to each of these individuals, inquiring about where that person was, and indicating that he would be leaving his house shortly and would stop by.  Based on the similarity of the telephone contacts between **JONES** and numerous individuals, and their content, all referring to locations and times to get together, investigators believe that, throughout the course of the interception period, on nearly a daily basis, **JONES** met with various individuals, both at his nightclub, **LEVELS**, and other large public facilities (e.g., Sam's Carwash), and exchanged narcotics for money.

22.  For example, on that date at 9:14 a.m., **JONES** called **MICHAEL HUGGINS** at (301) 702-1124, believed to be the home telephone number for **HUGGINS**, and spoke to an unidentified male, who told him that "Mike" wasn't there.  At 9:15 a.m., **JONES** called (240) 475-2981, the cellular telephone listed in the name of **MICHAEL HUGGINS**, and left a message asking "Mike" to call him.  Then, at 1:51 p.m., **JONES** called **HUGGINS** again at (240) 475-2981, and stated that he was "outside."  **HUGGINS** stated that he would be down in a couple of minutes.  Investigators believe that within a few minutes of this call, **JONES** and **HUGGINS** engaged in a narcotics transaction.

23.  **JONES** repeated this pattern throughout the course of the interception period.  For example, on Day 5, September 6, 2005, at 10:45 a.m., **JONES** received a call from (202) 355-2621, a phone known to be in use by **DONALD HUNTER**.  **HUNTER** told **JONES** to call him when **JONES** got into town.  **JONES** asked **HUNTER** whether he would be ready, to which **HUNTER** responded: "yeah."  Then, at 11:10 a.m., **HUNTER** again called **JONES,** at which time **JONES** told **HUNTER** that he would call **HUNTER** back in three minutes.  At 11:30 a.m., **JONES** called **HUNTER** and asked: "where you at, slim?"  **HUNTER** responded that he was at 8th and H.  **JONES** told **HUNTER** to come up to "where your girl work at,"and added a reference to what sounded like "the Circuit,"  to which **HUNTER** responded: "OK, I'm on my way."[1]  **JONES** called **HUNTER** again at 12:21 p.m., and stated: "I want to wash my car, go wash my car."  **HUNTER** asks whether he should go to the car wash, and **JONES** replied: "yeah."  Investigators believe that this was a thinly veiled attempt by **JONES** to communicate to

---

[1]        Agents believe that **HUNTER** has a romantic relationship with a woman who works at Circuit City on Branch Avenue in Temple Hills, Maryland.

**HUNTER** that they should meet at Sam's Carwash to conduct a narcotics transaction. Sam's Carwash is within the same block as the Circuit City on Branch Avenue, an area to which **JONES** referred numerous customers over the course of the interception period, in order to engage in cocaine transactions, and a location in which Confidential Source 1 frequently met with **JONES** to engage in cocaine transactions in 2004, as noted in your affiant's initial affidavit.

24. Further, as Confidential Source 1 indicated was **JONES'** practice, **JONES** uniformly speaks in code throughout the interception period, with only the very occasional slip-up. For example, he and his drug-trafficking colleagues speak frequently of the need for "tickets," which investigators believe to be a reference to wholesale quantities of cocaine, perhaps kilograms. They speak, too, of "VIP tickets" (larger quantities) and occasionally of "little tickets." For example, on September 7, 2005, Day 6 of the interception period, throughout the course of the day, **JONES** had discussions with several people, including **MAYNARD**, about the sale of "tickets." At 10:24 a.m., **JONES** called (240) 463-3129, a telephone registered in the name of Simona Adama, but which is believed to be in use by **JOHN ADAMS**, and asked whether he was "in the house." **ADAMS** told **JONES** that he would be there in 15 minutes. **JONES** told **ADAMS** to catch up with **MAYNARD** for that "ticket" and that **MAYNARD** "knows what to do with it." **JONES** also told **ADAMS** to call him once he got in the house, to which **ADAMS** replied: "10/4."

25. **JONES** then called **MAYNARD** at 10:25 a.m., and informed **MAYNARD** that "John" would be calling him in 15 minutes, and that he has the ticket for "Pauline." Agents note that throughout the course of the previous several days, there were telephone calls between **JONES** and **PAULINE SPENCE** that were suspicious in nature, regarding "tickets" and

17

"flyers." **SPENCE** has no known relationship to **JONES** or his club, **LEVELS**.

26.  One minute later, at 10:26 a.m., **JONES** called **SPENCE** and told her that **MAYNARD** was going to call her, and that he will have another ticket and will "take care of that," and that when he gets back from his trip to Baltimore, he would have another "VIP ticket."

27.  At 2:22 p.m., **JONES** received a call from an unknown female, who asked whether he remembered what she told him. **JONES** said "yeah, you need two more tickets." The conversation then turned to VIP tickets, and the fact that she has two tickets and does not need VIP tickets. **JONES** did not seem to understand what the female caller is saying, prompting her to say "do you understand me?" They then discussed the fact that she will need "front row" tickets soon, and **JONES** told her to call him and he will "take care of that" for her. Agents believe that this conversation deals with varying quantities of cocaine, and that "front row" tickets refers to the caller's desire for **JONES** to "front" cocaine to her, i.e., provide it to her on consignment.

28.  In addition, there were coded telephone calls on that date which appeared to refer to guns and money. For example, at approximately 10:06 a.m., **JONES** got a call from an unknown male at (202) 465-1651. After some conversation about the possible sale of a soda machine, the unknown male paused and then said, haltingly, that while **JONES** "probably doesn't need one," he would "holler at [**JONES**] later about that, um, that heater." When **JONES** asked what the male was talking about, the unknown male doesn't respond, at which point **JONES** asks: "what kind of heater?" And the unknown male says: "you know, the desert." They agree to talk more about this later. Investigators believe that **JONES** and the unknown male are discussing the possible purchase of a Desert Eagle gun, in part because guns are frequently referred to as "heat"

on the street.

29.  Further, at 10:33 a.m., **JONES** received a call from an unknown male at (202) 286-3057.  **JONES** told the caller that he was in his house, but was about to go to Baltimore to look at houses.  **JONES** asked the unknown male whether he had "done that math homework."  The unknown male, who sounded exasperated, stated: "there's no way in the world . . . I don't want to argue over it, there's nothing I can do about it, but I'm telling you, it's ridiculous . . . ."  **JONES** told him that he wished he could take the unknown male "there to see," and then asked "what was it, $3? $2?"  The unknown male replies that it was "way way more than that."  **JONES** then slipped and asked whether it was "more than 3,000, I mean $3."  The unknown male tells **JONES** that it is more than 5, "that's why I'm saying something's gotta be wrong."  They agree to discuss the matter further after **JONES** returns from his house-hunting trip to Baltimore.  Investigators believe that this conversation refers to a shortage of cash with respect to a narcotics deal.  As noted, at one point, **JONES** slips and refers to "3,000" but then recovers, saying "I mean, $3."  In addition, a money counting machine can be heard in the background.

30.  **JONES**, having returned from Baltimore, called that unknown male again at (202) 286-3057, at 2:14 p.m.  **JONES** asked the unknown male whether he was in the house, and when he responded that he was, **JONES** stated that he was coming over because he needed to talk to him.  A few minutes later, **JONES** received an incoming call from **ADRIAN JACKSON,** whom he had referred to as his "partner" in other intercepted conversations, and told **JACKSON** that he was going over to his man's house around the corner.  Investigators believe that **JONES** was going to meet with this unknown individual to discuss the financial problem discussed in the call earlier that day, and that **JONES** was informing **JACKSON** of his efforts to clear up the

19

problem.

31.    Throughout the remainder of the interception period, **JONES** and his colleagues continue to make reference to "tickets," in various forms, in a manner which investigators believe connotes wholesale quantities of cocaine.  For example, on Day 11 of the interception period, September 12, 2005, **JONES** urgently requested "two tickets" from **ADAMS**, who is believed to be the owner of at least one of **JONES'** stash houses, located just off of Branch Avenue, in Landover, Maryland – a location where **JONES** conducts much of his cocaine distribution – promising to get two tickets back to **ADAMS** the following day.

32.    Further, on Day 19 of the interception period, September 20, 2005, **JONES** had a conversation with **ADAMS** beginning at 1:08 p.m., in which  **ADAMS** told **JONES** that he would "have the ticket money" around 6:00 p.m.  **JONES** then told **ADAMS** that he still needed to "come through for Youngin" (an apparent reference to **DEMETRIUS JOHNSON**), to which **ADAMS** responded that **JONES** might as well wait until later, when he has the "ticket money."  Within 30 seconds of hanging up with **ADAMS**, **JONES** received an incoming call from **JOHNSON**, who discussed money with **JONES**, specifically that he is "26 in the hole."  After further discussion of numbers, **JONES** told **JOHNSON** that he has "it" and "won't do nothin' with it" until he hears from **JOHNSON**, after **JOHNSON** speaks with someone else and "gets it straight."  **JONES** also told **JOHNSON** during the course of the conversation that he has to get his car fixed first, but assured **JOHNSON** "I got you."  **JOHNSON** answered an incoming call from call waiting, and after approximately 40 seconds, returned to **JONES** who asked: "you're talkin' VIP, right?"  After **JOHNSON** assented, **JONES** told him to "call him back and tell him a couple of hours, right?"

33.   Based on these calls between **JOHNSON** and **JONES**, investigators believe that **JOHNSON** was brokering a cocaine deal between **JONES** and another individual, to whom they refer as "little dude." This pattern of telephone communications mirrors a pattern of conversations between **JONES** and **JOHNSON** on September 3, 2005, Day 2 of the interception period.  On that date, **JOHNSON** called **JONES** at 9:47 a.m.  **JONES** asked **JOHNSON** whether he wanted the "same old same old, or something different?"  **JOHNSON** replied that he would "call the dude back right now and see where's he's at and go from there."   Two minutes later, **JOHNSON** called **JONES** again and stated that "he didn't answer his phone, but nine out of 10 times he's waiting for me."  **JONES** told **JOHNSON** to call him, that he is "out and about."  **JOHNSON** then called **JONES** at 5:10 p.m., and told **JONES** that he is going to "shoot up there" to the Club, and called again at 5:51 p.m., telling **JONES** that he is 10 minutes away.  Finally, at 6:02 p.m., **JOHNSON** called **JONES** and told **JONES** that he was downstairs.  Investigators believe that within a few minutes of this call, **JONES** and **JOHNSON** conducted a narcotics transaction, which **JOHNSON** was likely brokering for another individual.

34.   Intercepted calls with similar content also confirmed investigators' suspicions, articulated in your affiant's initial affidavit, that **JONES** is supplying cocaine to **KIRK CARTER,** who has at least one conviction for narcotics trafficking.  For example, on September 9, 2005, Day 8 of the interception period, at 8:21 a.m., **JONES** called **CARTER** and asked if they got the last tickets from him.  **CARTER** replied "no, um, but you want me . .  You, um, going over there at halftime?"  **JONES** replied: "Nah, slim, I can do halftime with you, you ready for halftime?"  **CARTER** said: "I'll be over there and um make that delivery time . . .  I'll bring you your order over there."  **JONES** said that he would be over to where **CARTER** is in approximately 20 minutes.

21

CARTER agreed to wait for JONES.  Investigators believe that CARTER was making a delivery

of money to JONES, which CARTER owed for fronted narcotics.  Similarly, the next day, JONES

called CARTER at 5:51 p.m., and gave CARTER his new telephone number.  CARTER told

JONES that he wanted to see him.  JONES was on Branch Avenue, and agreed to meet CARTER

at the carwash.  CARTER called JONES again at 6:22 p.m., and informed him that he was at the

carwash.  JONES stated that he was about five minutes away.  At 6:27 p.m., JONES called

CARTER and asked "where you at?"  CARTER stated that he was at the McDonald's.

Investigators believe that shortly after this call, JONES and CARTER met at Sam's Carwash on

Branch Avenue and conducted a narcotics transaction.  Finally,  after a similar pattern of telephone

contacts on September 15, 2005, between JONES and CARTER, the pair agreed to meet again at

the carwash on Branch Avenue.  A surveillance team responded to that location in advance of

JONES and CARTER, and took photographs of their brief meeting at the carwash, and again a few

moments later in the Circuit City parking lot, a few blocks down Branch Avenue.[2]

    35.  Law enforcement surveillance further confirmed that KEVIN LAMONT HOLLAND,

who uses cellular telephone number (202) 277-8552, and who himself has a conviction for

Distribution of 50 Grams or More of Cocaine Base, is a significant customer of JONES'.  On very

nearly a daily basis throughout the course of the interception period, HOLLAND and JONES would

make arrangements to meet in various locations, usually along Branch Avenue, and, investigators

believe, exchange money and cocaine.  For example, within hours of the initiation of wire

---

[2]    Given the angle from which they were able to take photographs, it was impossible
to capture what JONES and CARTER were doing with their hands.  However, investigators
believe that at the Circuit City meeting, they observed CARTER toss a plastic bag into
JONES's champagne-colored Jeep Grand Cherokee.

interceptions on September 2, 2005, the following pattern of telephone contacts between **JONES** and **HOLLAND** occurred: at 5:14 p.m., **JONES** called (202) 277-8552, and said "hello" several times, and then hung up. At 5:15 p.m., **JONES** called **HOLLAND** again and got his voice mail, hanging up without leaving a message. Also at 5:15 p.m., **JONES** received an incoming call from **HOLLAND**, but **JONES** did not answer and no message is left. At 5:17 p.m., **JONES** received another call from **HOLLAND**, which similarly goes unanswered. Finally, at 5:19 p.m., **HOLLAND** got through on **JONES'** phone. **JONES** asked **HOLLAND** to meet him at the Club, to which **HOLLAND** replied "Yep." Following up on this previous telephone activity, **JONES** called **HOLLAND** at 5:51 p.m., and told **HOLLAND** that he was leaving the Club in a few minutes, and then inquired as to **HOLLAND's** whereabouts. **JONES** told **HOLLAND** that he will head out Branch Avenue, and will meet him near the carwash, and **HOLLAND** agreed. One minute later, **HOLLAND** called **JONES** and told him that he would be at Circuit City, because he needed some movies. Then, at 6:31 p.m., **JONES** received a call from **HOLLAND**, who stated that he was going to grab some "flyers" at an unintelligible location. **JONES** responded that he would pull around. Investigators believe that **JONES** and **HOLLAND** met within a few minutes of this call to conduct a narcotics transaction.

36. After monitoring these conversations for approximately two weeks, investigators were able to capture in still photographs **JONES** and **HOLLAND** in the course of what investigators believe to be a cocaine transaction. Specifically, after a similar pattern of telephone calls, in which **JONES** and **HOLLAND** agree to meet at Oxon Hill Plaza, in Oxon Hill, Maryland, a team of investigators responded to that area and set up covert surveillance. Within a few minutes of their arrival, **JONES** appeared, driving his champagne-colored Jeep, and **HOLLAND** appeared, driving

23

a silver Mercedes sedan, which is registered in his name.  In the course of this brief meeting, investigators observed and photographed **HOLLAND** tossing a white plastic shopping bag into **JONES'** Jeep and then quickly departing.  Within a few hours of this delivery, **JONES** and **HOLLAND** again agreed to meet.  Investigators believe that within a few minutes of that conversation, **JONES** delivered cocaine to **HOLLAND**.

37.  Further, in the course of the investigation leading up to the initial affidavit in support of the wire tap, pen register data revealed that towards the end of every month, **JONES** spoke with an individual on a cellular telephone number with a (713) area code , which was subscribed to in the name of Juan Lopez,[3] in McAllen, Texas, a major point of entry of narcotics into the United States. On September 20, 2005, **JONES** received two telephone calls from (713) 386-9548,[4] at 10:45 a.m., and again at 10:47 a.m. (the first call was apparently cut dropped mid-conversation), totaling 3 minutes and 46 seconds.  This is the first time that **JONES** has spoken with UM-1 during the course of the interception period.  During the call, UM-1 told **JONES** that he had been trying to find "some new music", but that it is getting a little rough on his side.  He assures **JONES**, however, that he has some "good people" who make some "good music," and that he is just waiting for them.  UM-1 then asks **JONES** whether he likes the music that UM-1 sent, to which **JONES** replies that "they love the sound, they love the entertainers, they love it."  **JONES** asks UM-1 whether they will take "a

---

[3]    Investigators believe that "Juan Lopez" is a fictitious name.  However, your affiant will refer to the user of this telephone as "UM-1" for ease of reference.

[4]    While this is a different number than showed up on the pen register on **JONES'** phone in previous months, UM-1 actually tells **JONES** in the course of this conversation that this is his new number, to which **JONES** replies that he will "lock it in."  Further, both (713) telephone numbers come back to "Juan Lopez."

couple weeks," to which UM-1 responds that he still has a little bit of music there.  **JONES** mentions that "they like the whole studio, they like how they can practice back-to-back," and that everyone is happy on this side "as far as the band." UM-1 states that it will take "a couple weeks, right," and **JONES** states "they just go ahead and be ready."  UM-1 replies that he just needs time to "put the music straight and everything together and that will work."  Later in the conversation, UM-1 tells **JONES** that he was just trying to see if everything was cool and to inform **JONES** that everything looks good on his end, to which **JONES** responds that they just need it in a week or two, so it's cool.  Also, twice in the conversation, **JONES** tells UM-1 that he is going to the "Studio" later that day.  Investigators believe that in this conversation, **JONES** and UM-1 are discussing the quality of the most recent multiple-kilogram shipment of cocaine ("how do they like the music?" and "they love the music") and also discussing the timing of a forthcoming shipment ("everything looks good on this end" and "a week or two is cool").

38.  Then, on Monday, September 26, 2005, at approximately 6:30 p.m., **JONES** called UM-1 at (713) 386-9548, and reported to UM-1 that he has been working around the clock to get things together so that the "studio" be ready.  UM-1 replies "great" and says that a "friend" is going to get everything together by Wednesday (believed to be September 28, 2005), and that they are going to pick up the "discs" of which they have nine remaining, and requests that **JONES** "give [him] a hand."  At that point, **JONES** cuts him off, saying "we got you, we got you – we can't do it no quicker but we're trying," stating that they have "been going 24 hours a day" with "100 things going," but that they should be ready by Wednesday.  Both men express a hope that, after Wednesday, everything will be in place so that they can "take a few days off."  Investigators believe that in this conversation, **JONES** and UM-1, who supplies cocaine to him, are discussing the timing

25

of the next big shipment of cocaine, and **JONES'** ability to collect money in advance from his customers to pay for this shipment.  In the hour after this call, **JONES** attempted to contact or contacted **ADAMS, HOLLAND, JOHNSON,** and **CARTER**.

39.  Further, with respect to **JONES'** supply chain, **JONES** has been making suspicious telephone calls with great frequency in recent days with telephone number (678) 330-7712, a Nextel cellular telephone, subscribed to in the name of John Yi, at an Atlanta, Georgia address.[5]   In these calls, all of which are initiated by **JONES**, **JONES** states simply "what's up" or "yeah" or "OK," to which UM-2 responds in kind.  In a few of these calls, **JONES** says "20 minutes," or "5 minutes," or similar. Investigators believe that through these calls, **JONES** is signaling to UM-2 a time to meet at a pre-ordained location, or perhaps a quantity of cocaine he plans to purchase (e.g., "5 minutes" may mean that **JONES** is seeking five kilograms of cocaine).  Investigators further believe that UM-2 may be the "friend" who is going to "hook everything up," to whom UM-1 referred in the September 26, 2005, telephone call with **JONES.**

40.  Finally, toll records pertaining to (678) 330-7712, have revealed that UM-2 utilizes the "direct connect" function on his telephone – which allows him to speak with another Nextel subscriber, if he specially identifies that number with Nextel, with the touch of one button.  Of the few telephone numbers he has specifically identified, two of them are these (713) numbers subscribed to by Juan Lopez, UM-1.  Thus, investigators believe that UM-1 and UM-2 are close associates of each other, and are likely members of the supply-chain leading to **JONES**.

---

[5]    Investigators similarly believe that this is a fictitious name, and for ease of reference, will refer to the user of this telephone as "UM-2.".

### C. **Extension Period -- September 30 - present**

41.   During the period since September 30, 2005, **JONES** continues his use of the code "tickets,"which investigators believe to be a reference to wholesale quantities of cocaine, perhaps kilograms.  Throughout the course of the current interception, **JONES**'s drug-trafficking colleagues speak frequently of their need for various numbers of "tickets,"  They continue to speak, too, of "VIP tickets" (larger quantities) and occasionally of "little tickets."  For example, on October 3, 2005, **JONES** and **JOHN ADAMS** discuss someone who needs four tickets. **ADAMS** says he has three tickets and needs one more. **JONES** says he thought **ADAMS** had four tickets. However, **JONES** then recalls that "peanut" got one of those tickets. **JONES** says he will be at **ADAMS's** house in about two minutes.   The following day, at 9:54 a.m., **JONES** called **ADAMS**, and asked whether that dude came and got "those three tickets." **ADAMS** replied that he hadn't but that he was coming that day.  **JONES** told **ADAMS** to call him as soon as that dude comes, because **JONES** had to pay the lease on the club, which had been in arrears, that day.  Later that day, at 4:58 p.m., **JONES** called **ADAMS**, who informed **JONES** that he was "waiting on him right now."  **JONES** planned to come see **ADAMS** later.  Then, at 5:58 p.m., **ADAMS** called **JONES** and told him that he sold those tickets and that he would be home in the next 20 minutes.  **JONES** said that he would catch **ADAMS** in the morning.  Investigators believe that in this series of conversations, **JONES** and **ADAMS** are discussing the sale by **ADAMS** of four kilograms of cocaine, and the arrangement for subsequent payment to **JONES** therefor.

42.   Wire interceptions further reveal the role of Texas suppliers in **JONES'** organization. For example, on Monday, October 10, 2005, **JONES** spoke with an unknown Hispanic sounding male (UM-1) on (713) 386-9548, who indicated that it should be another 7-8 days before things are

ready.  Throughout the course of this period, **JONES** also has had more frequent contact with another Hispanic sounding male (UM-3)[6] at (909) 975-0957, which is a Nextel cellular telephone registered in the name of Mike Wills in Irvine, California, and believed to be a fictitious name, in which the pair seem to meet on numerous occasions at a location which investigators believe to be a stash house in Ft. Washington, Maryland.  For example, on October 4, 2005, at 10:56 a.m., **JONES** called (909) 975-0957, and asked UM-3 what time he could get to "the spot."  The unknown male replied "15 or 20 minutes?"  **JONES** said "OK" and hung up the phone.  Then, at 11:19 a.m., UM-3 called **JONES** from (909) 975-0957, and stated that he was "already there."  **JONES** replied that he would be there in 10 minutes.  Based on the first call, a team of investigators quickly set up surveillance on a road near the suspected stash house in Ft. Washington, Maryland.  Sure enough, a short time after the second call, **JONES** drove into the neighborhood in his Jeep Cherokee, and was observed and photographed driving out of the neighborhood a few moments later, in the company of a Hispanic male.

43.  Similarly, on October 13, 2005, at 5:25 p.m., **JONES** called the (909) number.  UM-3 who answered said that he would only be around until 8:00 p.m., and then he was going to meet the girls.  **JONES** said he would swing by, either before then or the following morning.  **JONES** also referenced "20 of the VIP tickets."  **JONES** followed up on this call at 7:13 p.m, when he called the (909) number again and stated that he was 5-10 minutes away.  Approximately 30 minutes later, in rapid succession over the course of 8 minutes, **JONES** called **KEVIN HOLLAND**, **DEMETRIUS**

---

[6]      For clarity, we are using the designation "UM-3" in this affidavit to refer to the user of (909) 975-0957, because UM-2 has referred in the September 30, 2005, extension affidavit to another Hispanic sounding male, also believed to be a member of **JONES'** Texas-based supply chain.

**JOHNSON**, **MIKE HUGGINS**, and **JOHN ADAMS**, each call lasting between 41 seconds and 1 minute and 35 seconds. For unknown reasons, the wire tap equipment transmitted no audio with respect to these calls (or several non-pertinent calls thereafter). Investigators nonetheless note the significance of this flurry of calls by **JONES** to his usual purchasers, in the immediate aftermath of his meeting with the user of (909) 975-9057, a likely cocaine supplier, as **JONES** notifying his customers that another shipment was coming through.

44. It further became apparent from the interceptions that there were times within the month that **JONES** became low on cocaine, and was awaiting a large shipment from these Texas suppliers. For example, on Friday, September 30, 2005, **JONES** and **JOHN ADAMS** discussed whether **ADAMS** could sell someone five VIP tickets. **JONES** told **ADAMS** that at the moment it couldn't be done because there would not be enough for everyone else. Investigators believe that **JONES** is referring to the fact that his drug supply is low and if they make a larger sale now they will not be able to supply anything to their other customers.

45. This belief is confirmed by a call on Monday, October 3, 2005, between **JONES** and **DEMETRIUS JOHNSON**, in which **JONES** tells **JOHNSON** that he was trying to save a couple of tickets for **JOHNSON**, and that **JOHNSON** should holler at him when he was ready. And further confirmed by a call that **JONES** received at 4:25 p.m., on Tuesday, October 4, 2005, from UM-3 at (909) 975-0957, who stated that "um, Saturday, we are going to have that party after all," to which **JONES** replied "OK." And finally by a conversation on Wednesday, October 5, 2005, which confirmed investigators' suspicions that **JONES** was hoping to receive a shipment of cocaine from his suppliers over the coming weekend. At 11:44 a.m. that day, **SPENCE** called **JONES** and asked whether something was going to happen soon. **JONES** told **SPENCE** that he didn't want to talk

about it over the telephone, but that it would be soon.

  46. It is further apparent from wire interceptions that **JONES** anticipated another shipment of cocaine on October 13, 2005. For example, on October 12, 2005, at 12:36 p.m., **JONES** received a call from UM-3 at (909) 975-0957, who stated: "hey, the girls are coming tomorrow night." To which **JONES** responded in an animated voice: "gotcha, gotcha, gotcha." Then, in his next call, at 12:44 p.m., **JONES** called **JOHN ADAMS**, and told **ADAMS** to tell his brother-in-law "sometime tomorrow." Clearly confused, **ADAMS** said "huh?" **JONES** said "brother-in-law. Youngin didn't tell you about brother-in-law?" **JONES** repeated "tomorrow" several times throughout the conversation. Finally **ADAMS** seemed to understand, saying "Tomorrow? Oh, okay, you must mean my cousin." **JONES** told **ADAMS** that he needed to "see you all" today so that he could be ready with his video tomorrow. (Investigators believe that in this conversation, **JONES** is telling **ADAMS** that he needs to collect money from his customers to be ready for the cocaine shipment the following day). Then, at 12:47 p.m., **JONES** received a call from an unknown subscriber using cellular telephone number (202) 286-3057, who told **JONES** that he just wanted **JONES** to know that he was back. **JONES** and the caller discuss their whereabouts, and then at the end of the brief conversation, **JONES** said to the caller: "I was talking to your uncle, they they, he said he's gonna come talk to you tomorrow." Next, at 1:40 p.m., **JONES** received a call from **MIKE HUGGINS**. **JONES** told **HUGGINS** that he spoke with "Playboy" and then stated "tomorrow sometime, man." **HUGGINS** replied that he was waiting on **JONES**. Later, at 3:05 p.m., **JONES** called **ADRIAN JACKSON** and said: "Um, tomorrow." After there was a pause, **JONES** asked: "you know what talking about? Your uncle." **JACKSON** replied: "alright." **JONES** stated: "tomorrow." Further, at 7:40 p.m., **JONES** called (202) 286-3057, which is

registered in the name of Kim's Wireless, at 1801 Pennsylvania Avenue, and believed to be in use by **JONES's** "partner" **GREGORY HAWKINS**, and told the unknown male that "Youngin said he will probably see us tomorrow evening." The male replied "alright," and the pair hung up. Finally, at 9:18 p.m., **JONES** received an incoming call from an unknown male using telephone number (202) 276-5208. This male wanted to borrow $7,000 from JONES to pay two of the bands who perform and at **LEVELS**. **JONES** told the male that he didn't have that kind of money on him now, but noted that the man's uncle was supposed to be in town the following day. In sum, investigators believe that this pattern of thinly-veiled calls relates to the initial call from UM-3 at (909) 975-0957, indicating that something would be coming into town the following day, presumably a large quantity of cocaine. Throughout the day, **JONES** communicated with several of his customers, referring to this call with their "uncle" or other relative - the user of the (909) phone - and indicating that he would be in town the following day.

47. While it is not precisely clear when that shipment arrived, as of Saturday, October 15, 2005, **JONES** was flush with cocaine again. At 10:10 a.m. that day, **JONES** called **JOHNSON** and asked whether **JOHNSON** wanted him to come through and catch him. **JOHNSON** replied that he was still waiting on two dudes, and would call **JONES** as soon has he had caught up with them. Shortly thereafter, **JONES** called **HUGGINS** and told him he was about to "make a run" and asked what was up with **HUGGINS**. The pair agreed to meet at the Lowe's home improvement store in Clinton, Maryland. A subsequent call, at 11:45 a.m., revealed that **JONES** and **HUGGINS** met up at the Lowe's. Over the course of the next several hours, **JONES** called **GREGORY HAWKINS, KIRK CARTER, FNU, LNU, a/k/a JAUON JENKINS, JOHN ADAMS, DEMETRIUS JOHNSON, and ADRIAN JACKSON** arranging similar meetings. Investigators believe that

31

**JONES** delivered cocaine to each of these individuals throughout the day.

48.  Further confirmation of **JONES'**s drug trafficking activity comes from an arrest on October 14, 2005, of **DONALD HUNTER**, shortly after he arranged to meet with **JONES** at **LEVELS**.  That morning, **HUNTER** called **JONES** and said that he was going to stop by the club. Investigators set up surveillance, and observed his Jeep parked outside the club in the late morning. Once **HUNTER** emerged from **LEVELS**, investigators followed him for some distance, and then conducted a traffic stop of his car, based on an arrest warrant which was outstanding on **HUNTER** in an unrelated matter.  Recovered from **HUNTER** was approximately 50 grams of cocaine powder and a handgun.  After his arrest, **HUNTER** waived his rights and stated that the cocaine came from **JONES** and that he had arranged to return to **LEVELS** later that day to obtain more.  This assertion is supported by numerous telephone calls by **JONES** to **HUNTER's** telephone over the course of the next several days.

49.  Finally, wire interceptions over the past few days make clear that **JONES** and his associates are continuing their pattern of drug trafficking activity, as set forth above.  For example, on October 17, 2005, at 4:51 p.m., **JONES** called **CARTER** and asked whether he wanted some tickets.  **CARTER** replied that he would come see **JONES** the following day.  **JONES** mentioned that the tickets were $10.50, and **CARTER** said that he didn't know that.  They agree to discuss the price difference in person, not over the phone.  Further, **JONES** received a telephone call from UM-3, from (909) 975-9057, who said that he just wanted to let **JONES** know that "I took off where I live, and I will be out for a day or two."  To which **JONES** replied: "Ah, man."  UM-3 said that he would call **JONES** as soon as he got back.  True to his word, mid-day on October 19, 2005, UM-3 called **JONES** again, and indicated that he would be back in the area at approximately 5:00 p.m.

Also, late-morning this same day, **JONES** received a call from UM-1, another Hispanic male whom investigators believe to be associated with UM-3 in **JONES'** supply chain, indicating that something would be happening on Friday (October 21, 2005). Investigators believe that these telephone calls from **JONES's** suppliers are tipping **JONES** off to the timing of the arrival of a large shipment of cocaine.

## F. PROBABLE CAUSE FOR THE LOCATION

**1960 Montana Avenue, Northeast, Washington, D.C.**

_____50. This location is the night club operated by **ANTOINE JONES**. Source information, pen register and toll record analysis, physical surveillance and intercepted telephone communications reveal that **JONES** uses the club as a hub for his narcotics trafficking activities. For example, CS-1 has reported that **JONES** often sets up meetings at the club in order to conduct narcotics and money transactions. Further, the following is a sampling of intercepted communications between **JONES** and various of his associates: On Tuesday, September 6, 2005, **JONES** had a number of conversations with unknown individuals directing those individuals to the "back door" of **LEVELS**. Video surveillance at **LEVELS** during this time shows male individuals under the awning at one of the entrances **LEVELS**.

51. On Thursday, September 8, 2005 at 8:48 p.m., **JONES** received a call from **JOHN ADAMS**, stating that **ADAMS** was on his way to the club, and that he just got the money from the last "tickets." Again, Agents believe that **JONES** frequently uses "flyers" and "tickets" to connote various quantities of cocaine.

33

52. On Saturday, September 17, 2005, **JONES** and **MICHAEL HUGGINS** set up a meeting at a club. A surveillance agent observed a black male entering the back door of the club, and at the same time, wire interception recorded a call from **HUGGINS** to **JONES** in which **HUGGINS** stated: "I'm at the door." Similarly, throughout the interception period, calls have been intercepted regarding meetings at the club between **JONES** and his associates. These meetings have been confirmed by surveillance at this location.

## OFFENSES

53. Violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., including: (a) the possession with intent to distribute and distribution of controlled substances, in violation of Title 21 United States Code (USC) § 841(a)(1); (b) conspiracy to commit such offenses, in violation of 21 U.S.C. § 846; (c) the use or carrying of firearms during the course of the above offenses involving controlled substances, in violation of 18 U.S.C. § 924(c); (d) the use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 USC § 843(b); and (e) the laundering of proceeds of specified unlawful activity, such as the distribution of controlled substances, in violation of 18 U.S.C. §§ 1956 and 1957.

## CONCLUSION

54. Wherefore, based upon the facts and circumstances related above and my experience as a Detective of the Metropolitan Police Department, I believe that there is probable cause to believe that the following articles are present at the subject premises:

1) Controlled substances, to wit: Cocaine in violation of Title 21 United States Code

2) Paraphernalia for packaging, processing, weighing, and distributing controlled

substances, for example: scales, razor blades, plastic bags, and heat-sealing devices;

3) Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

4) Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

5) Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to-wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;

6) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, cell phones (and the numbers contained therein) diaries, utility and telephone bills, statements, identification documents, and keys;

and

8) Firearms and other dangerous weapons.

I swear and subscribe to the information contained in the Affidavit:

_____
NORMA J. HORNE
Detective
Metropolitan Police Department


Sworn to and subscribed before me
this ____ day of _____ 2005 in
the _____


_____
UNITED STATES MAGISTRATE JUDGE

36